3

Westlaw.

373 B.R. 742, 20 Fla. L. Weekly Fed. B 537
**(Cite as: 373 B.R. 742)**

C

United States Bankruptcy Court,
M.D. Florida,
Jacksonville Division.
In re B.L. JENNINGS, INC., et al., Debtors.
RKB Investments, et al., Plaintiffs,
v.
Brandon James Maxfield, et al., Defendants.
Janice K. Jennings, Plaintiff,
v.
Brandon James Maxfield, et al., Defendants.
Brandon James Maxfield, Plaintiff,
v.
Bryco Arms, et al., Defendants.
Brandon James Maxfield, Plaintiff,
v.
Bryco Arms, et al., Defendants.
**Bankruptcy Nos. 03-4928-3F1 to 03-4937-3F1.**
**Adversary Nos. 03-203, 03-345, 03-473, 04-107.**

June 12, 2007.

**Background:** Adversary proceedings were brought in
jointly administered bankruptcy cases of firearms de-
signer/manufacturer, his company, family trusts, and
corporation to pierce veil, to set aside alleged fraudulent
transfer of residential property, and to hold ex-wife li-
able for conspiring with individual debtor to effect
fraudulent transfer.

**Holdings:** The Bankruptcy Court, Jerry A. Funk, J.,
held that:
(1) debtor-partnership was alter ego of debtor-husband,
though debtor's wife, and not debtor, was designated as
party authorized to sign partnership documents;
(2) allegedly defective firearms manufactured by cor-
poration owned by ex-wife were manufactured as part
of joint venture that existed between spouses, so as to
make wife jointly and severally liable for injuries and
damages inflicted by these firearms;
(3) trusts that had ownership interest in corporation
were not liable, based solely on that ownership interest,
as additional joint venturers;

(4) imposition of constructive trust on assets of entities
that had been found to be alter egos of debtor was not
warranted;
(5) transfer of unencumbered residential property for no
consideration to debtor's ex-wife, after debtor was
named as defendant in tort action, was actually fraudu-
lent to creditors; and
(6) ex-wife was liable for conspiring to assist in fraudu-
lent transfer.

So ordered.

West Headnotes

**[1] Corporations 101 ☜1.3**

101 Corporations
    101I Incorporation and Organization
        101k1.3 k. Distinct Entity in General, Corpora-
tion As. Most Cited Cases
Under California law, corporation is ordinarily regarded
as legal entity separate and distinct from its stockhold-
ers, officers and directors, with separate and distinct li-
abilities and obligations.

**[2] Corporations 101 ☜1.4(1)**

101 Corporations
    101I Incorporation and Organization
        101k1.4 Disregarding Corporate Entity
            101k1.4(1) k. In General. Most Cited Cases
Under California law, courts will ignore the corporate
entity and deem corporation's acts to be those of persons
or organizations actually controlling it, as corporation's
alter egos, where corporate form is used to perpetrate a
fraud, circumvent a statute, or accomplish some other
wrongful or inequitable purpose.

**[3] Corporations 101 ☜1.4(1)**

101 Corporations
    101I Incorporation and Organization
        101k1.4 Disregarding Corporate Entity
            101k1.4(1) k. In General. Most Cited Cases
Under California law, question of whether corporate

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

373 B.R. 742, 20 Fla. L. Weekly Fed. B 537
**(Cite as: 373 B.R. 742)**

veil should be pierced depends on innumerable individual equities of each case.

**[4] Corporations 101 ⟜1.4(2)**

101 Corporations
    101I Incorporation and Organization
        101k1.4 Disregarding Corporate Entity
            101k1.4(2) k. Justice and Equity. Most Cited Cases

**Corporations 101 ⟜1.4(4)**

101 Corporations
    101I Incorporation and Organization
        101k1.4 Disregarding Corporate Entity
            101k1.4(4) k. Instrumentality, Agency, or Alter Ego. Most Cited Cases
Generally, alter ego liability exists under California law when there is such unity of interest and ownership that separate personalities of corporation and of individual no longer exist, and when inequitable result will follow if acts are treated as those of corporation alone.

**[5] Corporations 101 ⟜1.6(3)**

101 Corporations
    101I Incorporation and Organization
        101k1.6 Particular Occasions for Determining Corporate Entity
            101k1.6(3) k. Debts and Obligations of Corporation; Creditors' Remedies. Most Cited Cases
It is not a sufficient basis for piercing the corporate veil under California law merely to show that creditor will remain unsatisfied if corporate veil is not pierced.

**[6] Corporations 101 ⟜1.4(2)**

101 Corporations
    101I Incorporation and Organization
        101k1.4 Disregarding Corporate Entity
            101k1.4(2) k. Justice and Equity. Most Cited Cases
Purpose of veil-piercing doctrine under California law is not to protect every unsatisfied creditor, but to afford him protection where some conduct amounting to bad faith makes it inequitable for equitable owner of corpor-

ation to hide behind its corporate veil.

**[7] Corporations 101 ⟜1.4(4)**

101 Corporations
    101I Incorporation and Organization
        101k1.4 Disregarding Corporate Entity
            101k1.4(4) k. Instrumentality, Agency, or Alter Ego. Most Cited Cases
Finding of bad faith is not prerequisite under California law to application of alter ego doctrine.

**[8] Corporations 101 ⟜1.4(3)**

101 Corporations
    101I Incorporation and Organization
        101k1.4 Disregarding Corporate Entity
            101k1.4(3) k. Fraud or Illegal Acts. Most Cited Cases
Under California law, party seeking to impose alter ego liability need not prove actual fraud, just that failure to impose alter ego liability will result in injustice.

**[9] Corporations 101 ⟜1.4(2)**

101 Corporations
    101I Incorporation and Organization
        101k1.4 Disregarding Corporate Entity
            101k1.4(2) k. Justice and Equity. Most Cited Cases
Manipulation of assets to detriment of creditors supports a finding of inequitable result, such as will permit a piercing of corporate veil under California law.

**[10] Corporations 101 ⟜1.4(4)**

101 Corporations
    101I Incorporation and Organization
        101k1.4 Disregarding Corporate Entity
            101k1.4(4) k. Instrumentality, Agency, or Alter Ego. Most Cited Cases
While determination of alter ego liability is at its core an equitable one, which must be made on case-by-case basis under California law, there are various factors that courts consider, such as commingling of funds and other assets of the two entities, use of one as mere shell or conduit for affairs of the other, treatment by individual

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

373 B.R. 742, 20 Fla. L. Weekly Fed. B 537
(Cite as: 373 B.R. 742)

of entity's assets as his own, and failure to segregate funds of individual and entity.

**[11] Bankruptcy 51 ☜2559**

51 Bankruptcy
 51V The Estate
  51V(C) Property of Estate in General
   51V(C)2 Particular Items and Interests
    51k2559 k. Partnership and Individual Property. Most Cited Cases
Debtor-partnership was alter ego of individual Chapter 11 debtor, though individual debtor's wife, and not debtor, was designated as party authorized to sign any documents necessary for transacting partnership business, and though partnership and individual debtor each maintained separate bank accounts and books, where wife "managed" partnership solely as directed by her debtor-husband, and debtor-husband extensively commingled his funds with those of partnership, used partnership to purchase properties that he used as personal residence, and caused partnership to engage in transfer of property in alleged fraud of creditors.

**[12] Joint Adventures 224 ☜1.1**

224 Joint Adventures
 224k1.1 k. Nature of Relation in General. Most Cited Cases
Under California law, "joint venture" is undertaking by two or more persons to carry out a single enterprise for profit.

**[13] Joint Adventures 224 ☜1.2(1)**

224 Joint Adventures
 224k1.2 Essential Elements
  224k1.2(1) k. In General. Most Cited Cases
Under California law, elements of joint venture are: (1) community of interest in subject of undertaking; (2) a sharing in profits and losses; (3) an equal right, or a right in some measure, to direct and control conduct of each other and of enterprise; and (4) a fiduciary relationship between or among parties.

**[14] Corporations 101 ☜1.6(1)**

101 Corporations
 101I Incorporation and Organization
  101k1.6 Particular Occasions for Determining Corporate Entity
   101k1.6(1) k. In General. Most Cited Cases
Under California law, when corporation is used as instrumentality or agency in carrying out joint venture, courts will disregard corporate form and enforce joint venture agreement.

**[15] Joint Adventures 224 ☜1.2(1)**

224 Joint Adventures
 224k1.2 Essential Elements
  224k1.2(1) k. In General. Most Cited Cases
Under California law, while each of the four elements of joint venture, i.e., a community of interest, sharing of profits and losses, equal right to direct and control, and fiduciary relationship between parties, must be present before joint venture will be found to exist, court has certain amount of flexibility in determining whether these elements are present.

**[16] Joint Adventures 224 ☜1.2(7)**

224 Joint Adventures
 224k1.2 Essential Elements
  224k1.2(5) Community of Interest
   224k1.2(7) k. In Profits and Losses. Most Cited Cases
Under California law, while there must be a sharing of profits and losses in order for joint venture to exist, it is not necessary that the distribution to each joint venturer must be equal.

**[17] Joint Adventures 224 ☜1.2(8)**

224 Joint Adventures
 224k1.2 Essential Elements
  224k1.2(8) k. Joint Control. Most Cited Cases
Under California law, one joint venturer's right of control may be delegated to another, and mere fact that there has been such a delegation does not affect whether joint venture exists between parties.

**[18] Corporations 101 ☜1.6(13)**

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

373 B.R. 742, 20 Fla. L. Weekly Fed. B 537
**(Cite as: 373 B.R. 742)**

101 Corporations
    101I Incorporation and Organization
        101k1.6 Particular Occasions for Determining Corporate Entity
            101k1.6(13) k. Torts. Most Cited Cases

**Joint Adventures 224 &#9756;7**

224 Joint Adventures
    224k6 Rights and Liabilities of Parties as to Third Persons
        224k7 k. In General. Most Cited Cases
Under California law, allegedly defective firearms manufactured by corporation owned by wife of firearms designer were manufactured as part of joint venture that existed between spouses, so as to make wife jointly and severally liable, as joint venturer, for injuries and damages inflicted by these firearms, where corporation was mere instrumentality, that was created for sake of convenience in carrying out this joint venture, where requisite community of interest existed between spouses, where wife shared in profits and losses by receiving dividends as shareholder and receiving salary as president of corporation, where wife delegated authority to husband and followed his instructions in running corporation, and where fiduciary duties existed between parties, based on wife status as officer of corporate manufacturer that was dependent upon husband and his separate company for design and marketing of firearms.

**[19] Joint Adventures 224 &#9756;7**

224 Joint Adventures
    224k6 Rights and Liabilities of Parties as to Third Persons
        224k7 k. In General. Most Cited Cases
Under California law, trusts that had ownership interest in corporation that was created as matter of convenience to assist spouses in carrying out joint firearm manufacturing venture between them were not liable, based solely on that ownership interest, as additional joint venturers for injuries and damages inflicted by allegedly defective firearms.

**[20] Joint Adventures 224 &#9756;1.12**

224 Joint Adventures
    224k1.12 k. Contracts Not Creating Joint Adventures. Most Cited Cases
Under California law, passive investor in corporation is not himself a joint venturer in joint venture in which the corporation is involved merely by virtue of investor's ownership interest in corporation.

**[21] Trusts 390 &#9756;91**

390 Trusts
    390I Creation, Existence, and Validity
        390I(C) Constructive Trusts
            390k91 k. Nature of Constructive Trust. Most Cited Cases
Under California law, "constructive trust" is involuntary equitable trust created by operation of law as remedy to compel the transfer of property from the person wrongfully holding it to the rightful owner.

**[22] Trusts 390 &#9756;91**

390 Trusts
    390I Creation, Existence, and Validity
        390I(C) Constructive Trusts
            390k91 k. Nature of Constructive Trust. Most Cited Cases
Under California law, purpose of constructive trust is to prevent unjust enrichment and to prevent one from taking advantage of his own wrongdoing.

**[23] Trusts 390 &#9756;91**

390 Trusts
    390I Creation, Existence, and Validity
        390I(C) Constructive Trusts
            390k91 k. Nature of Constructive Trust. Most Cited Cases
Under California law, imposition of constructive trust requires: (1) existence of res; (2) right of complaining party to that res; and (3) some wrongful acquisition or retention of res by another party who is not entitled to it. West's Ann.Cal.Civ.Code §§ 2223, 2224.

**[24] Trusts 390 &#9756;91**

390 Trusts

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

373 B.R. 742, 20 Fla. L. Weekly Fed. B 537
**(Cite as: 373 B.R. 742)**

390I Creation, Existence, and Validity
  390I(C) Constructive Trusts
    390k91 k. Nature of Constructive Trust. Most
Cited Cases
Under California law, propriety of imposing construct-
ive trust is committed to sound discretion of trial court,
taking into account the facts and circumstances of case.
West's Ann.Cal.Civ.Code §§ 2223, 2224.

**[25] Bankruptcy 51 ☜2547**

51 Bankruptcy
  51V The Estate
    51V(C) Property of Estate in General
      51V(C)2 Particular Items and Interests
        51k2547 k. Property Held in Trust or Cus-
tody for Debtor; Deposits. Most Cited Cases

**Bankruptcy 51 ☜3594**

51 Bankruptcy
  51XIV Reorganization
    51XIV(C) Conversion or Dismissal
      51k3594 k. Effect; Proceedings in Converted
Case. Most Cited Cases
Imposition of constructive trust on assets of entities that
had been found to be alter egos of debtor was not war-
ranted, after Chapter 11 case was converted to one un-
der Chapter 7, and trustee was appointed.

**[26] Fraudulent Conveyances 186 ☜16**

186 Fraudulent Conveyances
  186I Transfers and Transactions Invalid
    186I(A) Grounds of Invalidity in General
      186k13 Badges of Fraud
        186k16 k. Conclusiveness and Effect. Most
Cited Cases
Statutory badges of fraud under the California Uniform
Fraudulent Transfer Act (CA-UFTA) do not create
mathematical formula to establish actual fraudulent in-
tent, and there is no minimum number of badges that
must be present before scales will tip in favor of finding
of actual intent to defraud; rather, list of badges is
meant to provide guidance to trial court, not compel a
finding one way or the other. West's Ann.Cal.Civ.Code

§ 3439.04(b).

**[27] Bankruptcy 51 ☜2727(3)**

51 Bankruptcy
  51V The Estate
    51V(H) Avoidance Rights
      51V(H)2 Proceedings
        51k2725 Evidence
          51k2727 Weight and Sufficiency
            51k2727(3) k. Fraudulent Transfers.
Most Cited Cases
Evidence presented on trustee's fraudulent transfer
avoidance claims showed that transfer of residential
property to debtor's ex-wife occurred, not at time of di-
vorce as part of equitable distribution of marital assets
between spouses, but only several years later, when
debtor executed deed in alleged fulfillment of his oblig-
ations following divorce, where no evidence was
presented, apart from self-serving testimony of debtor
and spouse, that divorce court had awarded marital res-
idence to spouse, where debtor's testimony was contra-
dicted by his prior statements that property was strictly
a profit-making investment, in which ex-wife had no in-
terest, and where ex-wife, despite having allegedly been
awarded this property by divorce court, did not pay
property taxes thereon, homeowners' association dues,
or costs of construction.

**[28] Fraudulent Conveyances 186 ☜24(3)**

186 Fraudulent Conveyances
  186I Transfers and Transactions Invalid
    186I(B) Nature and Form of Transfer
      186k24 Transactions Subject to Attack by
Creditors
        186k24(3) k. Description of Property, or
Consideration. Most Cited Cases

**Fraudulent Conveyances 186 ☜95(1)**

186 Fraudulent Conveyances
  186I Transfers and Transactions Invalid
    186I(G) Consideration
      186k95 Transactions Between Husband and
Wife

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

373 B.R. 742, 20 Fla. L. Weekly Fed. B 537
**(Cite as: 373 B.R. 742)**

186k95(1) k. Want or Insufficiency of Consideration. Most Cited Cases

**Fraudulent Conveyances 186 ⟲104(.5)**

186 Fraudulent Conveyances
   186I Transfers and Transactions Invalid
     186I(H) Confidential Relations of Parties
      186k103 Husband and Wife
       186k104 Transactions in General
        186k104(.5) k. In General. Most Cited Cases
Transfer of unencumbered residential property for no consideration to debtor's ex-wife, after debtor, a firearms designer/manufacturer, had been named as defendant in tort action filed on behalf of party injured by allegedly defective gun, was actually fraudulent to creditors under California law, and could be set aside by Chapter 7 trustee in exercise of strong-arm powers. 11 U.S.C.A. § 544; West's Ann.Cal.Civ.Code § 3439.04 (a)(1).

**[29] Conspiracy 91 ⟲9**

91 Conspiracy
   91I Civil Liability
     91I(A) Acts Constituting Conspiracy and Liability Therefor
      91k9 k. Conspiracy to Defraud. Most Cited Cases
Fraudulent transfer under the California Uniform Fraudulent Transfer Act (CA-UFTA) is tortious conduct, which will support conspiracy claim under California law. West's Ann.Cal.Civ.Code §§ 3439.01-3439.12.

**[30] Conspiracy 91 ⟲1.1**

91 Conspiracy
   91I Civil Liability
     91I(A) Acts Constituting Conspiracy and Liability Therefor
      91k1 Nature and Elements in General
       91k1.1 k. In General. Most Cited Cases
Under California law, conspiracy is not independent tort, but theory of liability.

**[31] Conspiracy 91 ⟲1.1**

91 Conspiracy
   91I Civil Liability
     91I(A) Acts Constituting Conspiracy and Liability Therefor
      91k1 Nature and Elements in General
       91k1.1 k. In General. Most Cited Cases
Chief purpose of civil conspiracy claim under California law is to extend liability beyond the principals who actually committed the tort.

**[32] Conspiracy 91 ⟲13**

91 Conspiracy
   91I Civil Liability
     91I(A) Acts Constituting Conspiracy and Liability Therefor
      91k12 Persons Liable
       91k13 k. In General. Most Cited Cases
In order for alleged co-conspirator to be liable on civil conspiracy claim under California law, he or she must be legally capable of committing the tort, i.e., he or she must owe a duty to plaintiff recognized by law and be potentially subject to liability for breach of that duty.

**[33] Conspiracy 91 ⟲1.1**

91 Conspiracy
   91I Civil Liability
     91I(A) Acts Constituting Conspiracy and Liability Therefor
      91k1 Nature and Elements in General
       91k1.1 k. In General. Most Cited Cases
Elements of civil conspiracy claim under California law are formation and operation of conspiracy and damages resulting to plaintiff.

**[34] Conspiracy 91 ⟲1.1**

91 Conspiracy
   91I Civil Liability
     91I(A) Acts Constituting Conspiracy and Liability Therefor
      91k1 Nature and Elements in General
       91k1.1 k. In General. Most Cited Cases
To be liable on civil conspiracy claim under California law, alleged conspirator must have knowledge that actu-

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

373 B.R. 742, 20 Fla. L. Weekly Fed. B 537
**(Cite as: 373 B.R. 742)**

al tort is planned, as well as intent to aid in its commission.

**[35] Conspiracy 91 🔗18**

91 Conspiracy
    91I Civil Liability
        91I(B) Actions
            91k18 k. Pleading. Most Cited Cases

**Conspiracy 91 🔗19**

91 Conspiracy
    91I Civil Liability
        91I(B) Actions
            91k19 k. Evidence. Most Cited Cases
Direct proof of agreement to defraud is not required in order for defendant to be liable on civil conspiracy claim under California law; requisite agreement may be established inferentially and by circumstantial evidence.

**[36] Conspiracy 91 🔗10**

91 Conspiracy
    91I Civil Liability
        91I(A) Acts Constituting Conspiracy and Liability Therefor
            91k10 k. Conspiracy to Hinder, Delay, or Defeat Creditors. Most Cited Cases
Former wife who joined with her ex-husband in signing deed that transferred residential property to another former spouse of husband, knowing that this deed was not replacement deed for any deed executed in connection with husband's divorce from this other woman and did not fulfill any obligations that husband owed under divorce decree, was liable for conspiring with her ex-husband to transfer this valuable, unencumbered asset in fraud of husband's creditors, where ex-wife knew, at time she executed deed, of substantial products liability claims against ex-husband and his company and of fact that deed served to remove this valuable, unencumbered asset from reach of creditors. 11 U.S.C.A. § 544; West's Ann.Cal.Civ.Code § 3439.04(a)(1).

***746 FINDINGS OF FACT AND CONCLUSIONS OF LAW***

JERRY A. FUNK, Bankruptcy Judge.

This proceeding came before the Court for a trial on January 24, 2006, January 25, 2006, January 26, 2006, January 31, 2006, and February 1, 2006. In view of the voluminous exhibits (approximately 3,000) and the record before the Court, the Court elected to take the matter under advisement and directed the parties to file post-trial memoranda. Upon the evidence and the arguments of the parties, the Court makes the following Findings of Fact and Conclusions of Law.

*FINDINGS OF FACT*

Brandon James Maxfield ("Maxfield") is an individual who was injured when a handgun designed by Bruce Jennings, manufactured by Bryco Arms, Inc. ("Bryco"), a firearms manufacturer, and distributed by B.L. Jennings, Inc. ("B.L.Jennings"), a firearms distributor, accidentally discharged and injured him. Maxfield obtained a judgment against Bruce Jennings, Bryco, and B.L. Jennings. Linda Bullard is the mother of William O. Bullard, III, who was allegedly killed by a Bryco handgun. Bullard's claim has not been determined as to either liability or damages. Gary and Deborah Kramer are the parents of Jacob Kramer who was allegedly injured by a Bryco handgun. Kramer's claim has likewise not been determined as to liability or ***747** damages. The Court classified these three sets of parties as plaintiffs for ease of reference although they are technically defendants in two of the adversary proceedings. In addition to Maxfield, Bullard, and Kramer, there are approximately eleven other parties who were named as defendants in the two declaratory actions filed by the debtors. These parties all alleged damages from firearms manufactured by Bryco and distributed by B.L. Jennings. All of these parties have either been defaulted or otherwise elected not to participate in the trial.

Bruce Jennings was the sole shareholder of B.L. Jennings. Although he was not technically an officer of Bryco, Bruce Jennings was involved in its day-to-day operations, *In re Jennings,* 332 B.R. 465, 466 (Bankr.M.D.Fla.2005), and served as a "consultant" to the company since its inception. (Tr. at 935:10-13;

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

373 B.R. 742, 20 Fla. L. Weekly Fed. B 537
**(Cite as: 373 B.R. 742)**

596:16-597:1.) Bryco sold its handguns mainly to B.L. Jennings. (*Id.*)

Janice Jennings was Bruce Jennings' second wife. Bruce Jennings and Janice Jennings were married in March 1975 and divorced in December 1984. (Maxfield's Exs. 697, 699.) Bruce Jennings' divorce from Janice Jennings incorporated a detailed Marital Settlement Agreement. (Tr. at 99:8-14.) Bruce Jennings and Janice Jennings had two children of the marriage, Kimberly Jennings and Bradley Jennings. (Maxfield's Ex. 697.) Bruce Jennings also has a daughter from a previous marriage, Rhonda Jennings. (Tr. at 98:23-25.) Bryan Miller was Bruce Jennings' stepson (Tr. at 55:8-9), who passed away on April 24, 1987. [FN1] (Tr. at 57:13-15.)

> FN1. Mr. Ruggieri, counsel for Maxfield, stated that Bryan Miller died on April 24, 1997. It is clear to the Court, however, through his line of questioning, that Mr. Ruggieri intended to say 1987.

### California Trusts

In May 1981, Bruce Jennings and Janice Jennings established the Rhonda D. Jennings California Trust and the Kimberly K. Jennings California Trust, and in February 1983, Bruce Jennings and Janice Jennings established the Bradley A. Jennings California Trust (collectively the "California Trusts"). (Debtors' Exs. 782-784.) Bruce Jennings and Janice Jennings were co-trustees of the California Trusts. (*Id.*) The respective beneficiaries of the California Trusts were Rhonda Jennings, Kimberly Jennings, and Bradley Jennings. The California Trusts, by their terms, call for the distribution of the trust res to the beneficiary upon his or her twenty-fifth birthday. (Debtors' Exs. 782-784.) In June 1992, the Rhonda D. Jennings California Trust matured and was distributed to Rhonda Jennings pursuant to the terms of the trust instrument. (Tr. at 474:12-24.)

The California Trusts filed separate tax returns from their inception up to and including their filing for bankruptcy. (Debtors' Exs. 16-51, 68-101, 103-121.) The California Trusts kept separate books and records from the other defendants in these adversary proceedings. (Debtors' Exs. 1-121.)

### RKB Investments

In 1987, Bruce Jennings and Janice Jennings, as co-trustees of the California Trusts, created RKB Investments ("RKB"), a California General Partnership, the three general partners of which were the California Trusts. (Debtors' Ex. 224.) RKB's purpose was to develop real estate in California. Bruce Jennings managed RKB's real estate portfolio. (Tr. at 162:7-13). Janice Jennings' duties with RKB were to manage its checkbooks and business records. (Tr. at 862.) Janice Jennings also signed RKB's tax returns. (Tr. *748 at 978:3-4.) The Statement of Partnership for RKB, which was recorded in the public records, designated Janice Jennings as the agent of the partnership authorized to sign any documents necessary to transact partnership business. (Debtors' Ex. 265.) Although Bruce Jennings and Janice Jennings testified that they "managed" RKB together as "co-trustees" (Tr. at 862:4-11; 977:25-978:1), the Court finds that Bruce Jennings managed RKB and that Janice Jennings' management of RKB was limited to Bruce Jennings' instruction. RKB has always maintained separate bank accounts from all of the other debtors in these proceedings. (Debtors' Exs. 225-263, 274.)

The following discussion centers on evidence which was presented to the Court in the form of a chart. That chart has been duplicated as follows, with unnecessary evidence having been deleted. The chart references financial transactions which occurred between Bruce Jennings, RKB and the California Trusts beginning in 1987 and ending in 2004.[FN2]

> FN2. The figures evidenced in the Chart can be found in the record as follows:

| RKB Investments/CA Trusts' Debt To Bruce Jennings' Bankruptcy Estate |
| --- |

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

373 B.R. 742, 20 Fla. L. Weekly Fed. B 537
**(Cite as: 373 B.R. 742)**

| Cell | Supporting Evidence |
|------|---------------------|
| 1-D | (Tr. at 285:14-286:15; 330:22-332:1; 332:6-9; 333:18-334:1; 336:2-6; 344:18-345:15; 346:22-347:1; 349:7-15; 350:2-7; 355:6-9) Claimed cash deposit of $15,000 from CA Trusts, plus claimed $78,000 oral interest in Carter Court in repayment of debt owed by Bruce Jennings to Rhonda and Kimberly CA trusts. |
| 2-C | (Tr. at 323:6-11) |
| 4-C | (Tr. at 285:14-286:15; 330:22-332:1; 332:6-9; 333:18-334:1; 336:2-6; 344:18-345:15; 346:22-347:1; 349:7-15; 350:2-7; 355:6-9; 362:9-12) Carter Court value at time of sale, minus $78,000 previously credited to Rhonda and Kimberly CA trusts. |
| 5-C | (Tr. at 358:10-360:2; 362:9-16; 361:6-17; Maxfield's Ex. 755) Cowan purchase price of $1,238,939, minus $300,000 cash available from $439,500 Cowan sale which included $139,500 2nd mortgage. |
| 7-D | (Maxfield's Ex. 1520) |
| 8-D | (Maxfield's Ex. 1519) |
| 9-C | (Tr. at 287:18-20; 323:1-5) |
| 10-C | (Tr. at 287:18-20; 323:1-5) |
| 11-D | (Maxfield's Ex. 1518) |
| 12-C | (Tr. at 288:1-8; 322:21-25) |
| 13-C | (Tr. at 287:21-25; 322:15-18) |
| 14-C | (Tr. at 288:1-8; 322:21-25) |
| 15-D | (Tr. at 232:19-233:10; 241:9-242:6) |
| 16-D | (Maxfield's Ex. 1521) |
| 18-C | (Tr. at 960:20-23; Maxfield's Ex. 1755) |
| 19-C | (Tr. at 230:25-231:3; 288:9-17; 323:12-324:9; Maxfield's Ex. 1754) |
| 20-D | (Maxfield's Ex. 1508) |
| 21-C | (Tr. at 961:6-9; Maxfield's Ex. 1810) |
| 22-C | (Tr. at 288:9-17; 289:15-18; 323:2-324:9) Purchase price of $415,000 minus $150,000 lien. Claimed partial repayment by RKB Investments to Bruce Jennings. |
| 23-C | (Tr. at 289:11-14) Claimed partial RKB Investments repayment to Bruce Jennings. |
| 24-C | (Tr. at 961:12-15; Maxfield's Ex. 1813) |
| 25-D | (Maxfield's Ex. 1509) |
| 26-C | (Tr. at 961:16-19) |
| 26-D | (Maxfield's Ex. 1504) |
| 27-C | (Tr. at 231:9-232:15) |
| 27-D | (Maxfield's Ex. 1503) |
| 28-D | (Maxfield's Ex. 1510) |
| 29-D | (Maxfield's Ex. 1506) |
| 30-D | (Maxfield's Exs. 1513 & 1502) |
| 31-D | (Maxfield's Exs. 1512 & 1501) |

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

373 B.R. 742, 20 Fla. L. Weekly Fed. B 537
**(Cite as: 373 B.R. 742)**

| 32-D | (Maxfield's Exs. 1511 & 1505) |
|---|---|
| Column E | Maxfield's Summary Ex. 1877, p. 1 (summary of Maxfield's Exs. 1343, 1345, 1347, 1350, 1352, 1354-1356, 1359, 1368-1374, 1433, 1435, 1437, 1439, 1442, 1444, 1446, 1447, 1449, 1458-1464) |
| Column F | Maxfield's Summary Ex. 1877, p. 2 (summary of Maxfield's Exs. 1501-1522), minus income tax payments in Column E. |
| Column G | Computed values: Running total of amounts in Column C. |
| Column H | Computed values: Running total of amounts in Column D plus credit for income tax payments in Column E. |
| Column I | Computed values: Column G + running total of Column F profits x (Column G/Column G+Column H) |

*749



*750

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

373 B.R. 742, 20 Fla. L. Weekly Fed. B 537
**(Cite as: 373 B.R. 742)**



Between 1987 and the end of 2004, Bruce Jennings placed $9,782,679 [FN3] in RKB and withdrew $420,000 [FN4], leaving $9,362,679 [FN5] net principal in RKB. During this same time period, the California Trusts deposited $93,000 [FN6] into RKB and withdrew $5,972,294 [FN7], out of which they paid RKB's income taxes of $1,501,626 [FN8], resulting in a $4,377,668 [FN9] net cash withdrawal by the California Trusts. RKB earned after-tax net profits of $2,303,308 [FN10] since 1987. Treating Bruce Jennings' contributions as an investment, at of the end of 2004 RKB was holding $11,660,412 [FN11] of Bruce Jennings' money.

FN3. See Chart, sum of figures in cells 2C, 4C-5C, 9C-10C, 12C-14C, 18C-19C, 21 C, 24C, and 26C-27C.

FN4. See Chart, sum of figures in cells 22C-23C.

FN5. Chart, cell 35C.

FN6. Chart, cell 1D.

FN7. See Chart, sum of figures in cells 7D-8D, 11D, 15D-16D, 20D, and 25D-32D.

FN8. Chart, cell 35D.

FN9. See Chart, sum of figures in cells 35D and 35H.

FN10. Chart, cell 35F.

FN11. Chart, cell 35I.

Gary Genske ("Genske"), Bruce Jennings' accountant since 1984, testified that Bruce Jennings transferred $8,392,423 to RKB (Tr. at 812:4-7), that certain real property [FN12] was withdrawn out of RKB at a value of $6,175,807 (Tr. at 813:2-4), and that cash or cash equivalents in the amount of $956,571 were distributed to Bruce Jennings (Tr. at 813:5-9), which Genske testified was comprised of a note receivable in the amount of $85,005, a $10,000 title company deposit held in escrow, and an $850,000 withdrawal from a mutual fund. (Tr. at 816:8-17.) After taking these withdrawals into account, Genske testified that RKB owes Bruce Jennings $1,260,045. (Tr. at 820: 8-14.)

FN12. This property was the Shoreview Property, which will be discussed *infra.*

There is no documentation concerning the nature of Bruce Jennings' contributions*751 to RKB (Tr. at 58:6-18), although he had prepared detailed financial documentation in other contexts. (Tr. at 317:9-318:22.) In 1994, Bruce Jennings testified in the *Sebastiano* case

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

373 B.R. 742, 20 Fla. L. Weekly Fed. B 537
**(Cite as: 373 B.R. 742)**

[FN13] that his contributions to RKB were loans, which were intended to be repaid to him with interest. (Tr. at 64:10-65:9.) In 2002, Bruce Jennings answered interrogatories in the Maxfield personal injury case [FN14], asserting that his contributions were investments, which were intended to be repaid to him in proportion to the amount invested. (Tr. at 59:16-61:10.) Bruce Jennings has previously denied making a gift (Maxfield's Ex. 1783; Tr. at 49:8-23), and has never filed gift tax returns for the money transferred to RKB. (Tr. at 243:20-244:1; 826:12-15.) Additionally, at his October 1, 2003 deposition in his bankruptcy case, Bruce Jennings testified that "it was never intended that there was a gift or transfer of that money to [RKB]. It was intended that the money be returned to me and/or the property be returned to me in the future." (Maxfield's Ex. 1783; Tr. at 49:19-23.)

   FN13. This case is referenced during testimony by Bruce Jennings as *Sebastiano v. Bryco*. During discovery for the *Sebastiano* case, Bruce Jennings gave deposition testimony on March 17, 1994. Part of that deposition was read aloud by Mr. Ruggieri, and was later admitted into evidence. (Tr. at 117:2-118:10.)

   FN14. In May 2001 Maxfield commenced an action in California Superior Court against Bruce Jennings, Bryco, and B.L. Jennings to recover for the personal injuries he suffered (the "Maxfield personal injury case"). (Tr. at 176:20-23.) Bruce Jennings was joined as a defendant in September 2001. (Tr. at 176: 24-177:2.)

At the trial of these adversary proceedings, Bruce Jennings testified that he did not memorialize the details of his infusion of money to RKB because he had never decided how to treat it, whether as loans or as contributions in real estate. (Tr. at 320:18-23.) Jennings now claims that he decided years ago that he did not wish to receive interest or profits on his money (Tr. at 62:11-63:7; 65:16-20), and that after taking into account certain transfers or withdrawals, RKB owes him $1,260,045. (Tr. at 466:8-10; 479:2-20; and 479:23-480:4.)

Bruce Jennings' transfers in and out of RKB were carried for tax purposes as additions to and deductions from the California Trusts' individual capital accounts. (Tr. at 812:22-813:23.) Any profits or losses which occurred with respect to RKB's holdings were reflected only on the income tax returns of RKB and the California Trusts and not on Bruce Jennings' tax returns. (Debtors' Exs. 286, 292.) Nothing in the tax returns of Bruce Jennings (Maxfield's Exs. 1381-1396), RKB (Maxfield's Exs. 1501-1522), or the California Trusts (e.g. Maxfield's Exs. 1347, 1352, 1355, 1356, 1359, 1365-1374, 1523), reflects a relationship between Bruce Jennings and RKB or Bruce Jennings and the California Trusts. Although Bruce Jennings was audited once by the Internal Revenue Service and twice by the State of California (Tr. at 843:3-5), the audits did not involve any issues as to RKB or the California Trusts. (Tr. at 845:3-6.)

### Nevada Trusts, Janice Jennings and "Jennings Firearms"

After his divorce from Janice Jennings, Bruce Jennings owned what is now known as B.L. Jennings. (Tr. at 401:17-20.) At some time after the divorce, Bruce Jennings envisioned a new entity to manufacture guns, which would later become Bryco, with the intent that Janice Jennings and the children (through some form of ownership) would be owners of such entity. (Tr. at 401:21-402:10; 403:22-404:2; Maxfield's Br. at 41.) Bruce Jennings, Janice Jennings, Bryan Miller, and Bruce and *752 Janice Jennings on behalf of the three younger children entered into an oral agreement which initiated the start-up of Bryco. (Tr. at 402:11-403:15.) Based upon a three-year business plan, Bruce Jennings would design a new line of guns bearing the "Jennings" name, Janice Jennings and the children (through some form of ownership) would manufacture the guns through Bryco, and B.L. Jennings would market the guns. (Tr. at 385:25-386:6; 404:15-18; 405:13-18; 406:5-11; 931:20-932:9.) The "Jennings Firearms" name and fencer/pirate logo were to be used to identify the products as part of the "Jennings Family Group". (Tr. at 932:22-933:22.)

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

373 B.R. 742, 20 Fla. L. Weekly Fed. B 537
**(Cite as: 373 B.R. 742)**

In April 1987 [FN15], Bruce Jennings and Janice Jennings established the Rhonda D. Jennings Nevada Trust, the Kimberly K. Jennings Nevada Trust, the Bradley A. Jennings Nevada Trust, and the Bryan M. Miller Nevada Trust (collectively the "Nevada Trusts"). (Maxfield's Exs. 1543-1546.) Bruce Jennings was the settlor and Janice Jennings was the trustee of the Nevada Trusts. (*Id.*) The respective beneficiaries of the Nevada Trusts were Rhonda Jennings, Kimberly Jennings, Bradley Jennings, and Bryan Miller. The Nevada Trusts, by their terms, call for the distribution of the trust res to the beneficiary upon his or her thirty-fifth birthday. (*Id.*)

> FN15. The document states May 1987, but Bryan Miller died in April 1987. As a result, Bruce Jennings testified that he filled out the trust instruments at a later date and misdated the documents. (Tr. at 57:16-24.) The Court finds that this was an innocuous error and not an intention to back-date so as to have a valid trust for a beneficiary who had already passed away.

Bruce Jennings funded $9,000 for each child's or each trust's initial contribution to Bryco (Maxfield's Exs. 121 and 1546), and Janice Jennings supplied her own $9,000 initial contribution. (Tr. at 1033:9-19.) Bryco issued stock to Janice Jennings and the children, but Janice Jennings and the Nevada Trusts filed the tax returns, took distributions, and were listed as the responsible parties. (Tr. at 48:52-51:1; 430:19-431:17; 435:7-13; 436:5-8; Maxfield's Exs. 1480 and 1867.)

Janice Jennings, listed as the president of Bryco, was also the only member of its board of directors. (Tr. at 938:22-939:12.) As aforementioned, Bruce Jennings has been a "consultant" to Bryco since the company's inception. (Tr. at 987:14-16.) Bruce Jennings solely designed the guns to be manufactured by Bryco, and never submitted his designs for approval by Janice Jennings or any other Bryco employee. (Tr. at 938:9-14.) Indeed, Bruce Jennings never even sought Janice Jennings' authorization before Bryco manufactured the guns he designed. (Tr. at 939:22-24; 940:7-11.)

While Janice Jennings was president of Bryco, she did not begin coming to the office and drawing a salary until about ten years after Bryco was established, sometime in 1997. (Tr. at 380:16-381:13; 933:23-934:4.) In his role as "consultant", Bruce Jennings took care of organizing and hiring (Tr. at 382:16-383:3; 406:12-24), decided what machinery to purchase, what molds to use, what fixtures to prepare, the cost accounting of gun parts, and selected suppliers, and employees. (Tr. at 384:10-385:8.) Specifically, Bruce Jennings hired Tom Carr ("Carr") in late 1987 (Tr. at 500:15-17; 503:20-505:6; 514:2-9), and attorney William Slipp ("Slipp") as house counsel and general manager, who worked for 18 months in 1991-1993. (Tr. at 557:20-22; 554:2-555:14.) Carr testified that he took all of his instructions from Bruce Jennings (Tr. at 522:25-523:9), and the only person he ever saw exert *753 controlling authority at Bryco was Bruce Jennings. (Tr. at 533:18-23; 548:19-21.) In addition, Slipp testified that he interacted with Bruce Jennings on a daily basis (Tr. at 556:12-17), and that he and the other Bryco managers viewed Bruce Jennings as their supervisor. (Tr. at 558:4-17.)

In 1998, pending litigation prompted a decision to terminate the Nevada Trusts' involvement in Bryco, at which point Janice Jennings became the sole owner. (Tr. at 439:2-22; 934:11-18.) As sole owner, Janice Jennings authorized to herself Bryco stock distributions of $200,000 and $600,000, from which she used funds to buy out the Nevada Trusts' 60% ownership interest for $62,700. (Tr. at 440:20-441:23; 1020:12-15; 1067:25-1070:4.)

The first guns released for distribution, designed by Bruce Jennings and manufactured by Bryco, had "Jennings Firearms" imprinted on the side as a brand name (Tr. at 966:3-6), or a trade name (Tr. at 396:19). The guns, Models 38, 48 and 25, also included model designations which included the Jennings name, such as "Jennings Model 59", "Jennings J-22", etc. (Tr. at 393:2-395:12, 587:7-12.) B.L. Jennings also printed company literature which identified the enterprise as "Jennings Firearms" (Tr. at 398:2-9), and referred to "The Jennings Family" (Maxfield's Ex. 218).

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

373 B.R. 742, 20 Fla. L. Weekly Fed. B 537
(Cite as: 373 B.R. 742)

As aforementioned, B.L. Jennings was Bryco's only customer. (Tr. at 935:10-13; 596:16-597:1.) There was no contract between Bryco and B.L. Jennings which set the prices for the guns (Tr. at 411:21-25), nor is there any evidence of any negotiations for setting prices (Tr. at 942:14-24; 943:12-18). Furthermore, when B.L. Jennings placed orders with Bryco, it would prepay the amount due (Tr. at 444:11-16), so as to allow Bryco the ability to buy the parts necessary to make the guns, pay expenses, and manufacture and ship the guns (Tr. at 443:8-16). Bryco did not have a sales department, marketing department, or design department (aside from Bruce Jennings' designs). (Tr. at 1030:23-1031:6.) Bryco did not promote the sale of its guns. (Tr. at 1030:13-15.) Bryco never attempted to increase its sales by attempting to locate and sell its guns to other distributors. (Tr. at 1031:18-1032:2.) As for advertising, B.L. Jennings handled all the advertising of the "Jennings Firearms" manufactured by Bryco. (Tr. at 393:7-10; 943:24-944:1.) Moreover, when the Bureau of Alcohol, Tobacco, Firearms and Explosives ("BATF") conducted an investigation of three of Bruce Jennings' then-companies-Calwestco, Inc., Jennings Firearms, Inc. (CA), and Jennings Firearms, Inc. (NV)-in 1988, it concluded that "serious violations of the Gun Control Act were discovered", namely that official licensing documents had been "purposefully falsified ... for the sole purpose of shielding an individual (Bruce Jennings), who appears to be involved in the day-to-day operations, but is not shown on the documents ... as being an owner or responsible person." (Maxfield's Ex. 1867.074.) As a result, the federal licenses for those three companies were revoked, and an admonitory letter was sent to Bryco. (*Id.*)

In 1997, at a time when litigation was pending against Bruce Jennings and his various corporations, Janice Jennings voluntarily pledged a security interest in all of Bryco's assets to a major supplier. (Tr. at 1049:18-1050:5; Maxfield's Ex. 1550.) In addition, Bryco had opened a checking account in its secretary's name, Claudia Mellado ("Mellado"), which it used for almost a year for its operating expenses, and into which it had deposited checks that B.L. Jennings had written to Mellado. (Tr. at 42:14-43:11; 44:25-46:21; 874:5-18;

*754 875:13-25; 1020:25-1021:3; 1049:10-17.) Janice Jennings authorized a distribution to herself and the Nevada Trusts of $320,000 from Mellado's account. (Tr. at 48:22-51:1.)

The Nevada Trusts received dividends as shareholders of Bryco, which were then placed into interest-bearing money market accounts. (Debtors' Exs. 123-132, 157-166, 191-200.) The Nevada Trusts also filed separate tax returns from their inception up to and including their filing of bankruptcy. (Debtors' Exs. 133-155, 167-189, 201-233.) Separate books and records were maintained by the Nevada Trusts from each other and any other defendant in these adversary proceedings. (Debtors' Exs. 123-155, 157-189, 191-223.) The Rhonda Jennings Nevada Trust matured in June 2002 and was distributed to Rhonda Jennings pursuant to the terms of the trust instrument. (Tr. at 474:12-475:6, Debtors' Ex. 190.) After Bryan Miller's death, his shares of stock in Bryco were distributed to Janice Jennings. (Tr. at 436:9-12.)

### Shoreview Property

Bruce Jennings and his third wife, Anna Leah Jennings, were married in 1986. (Tr. at 93:8-11.) Both had been divorced twice before. (Tr. at 93:15-17.) As the Court previously noted, Bruce Jennings' 1984 divorce from Janice Jennings had incorporated a detailed Marital Settlement Agreement. (Tr. at 99:8-14.) Anna Leah Jennings had an interior design business (Tr. at 101:2-3), worked with contractors (Tr. at 101:4-5), served as trustee of some trusts (Tr. at 100:18-22), and was familiar with deeds and recorded instruments. (Tr. at 101:6-9.)

In 1991, Bruce Jennings used $950,000 of his personal funds to purchase a lot at 10 Shoreview, Newport Coast, California (the "Shoreview Property"), and took title to the property in the name of RKB. (Tr. at 86:16-25.) Construction of a residence on the Shoreview Property began in 1994 or 1995, with the certificate of occupancy finally issuing in 1998. (Tr. at 93:4-7.)

Products liability suits against gun manufacturers were

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

373 B.R. 742, 20 Fla. L. Weekly Fed. B 537
**(Cite as: 373 B.R. 742)**

"heating up" in the early 1990's. (Tr. at 108:12-16.) Bruce Jennings had attempted to set up an offshore insurance company but had been unsuccessful and decided to go without product liability insurance in 1994. (*Id.* at 17-23.) Bryco's product liability insurance lapsed on April 1, 1994, five days before Maxfield was injured. (Tr. at 927:2-4.)

In May 1995, Bruce Jennings and Anna Leah Jennings executed a marital settlement agreement, hired a Nevada divorce attorney, and petitioned for divorce. The divorce decree, which incorporated the marital settlement agreement, was issued the next day. (Maxfield's Exs. 1011, 1201; Tr. at 109:13-15, 110:8-11, 119:7-12). The parties requested and received an order sealing the divorce file from public view. (Tr. at 109:13-18.)

The divorce agreement did not mention any property by name, did not mention any funds by amount, and provided no specification as to what belonged to Bruce Jennings and what belonged to Anna Leah Jennings. (Maxfield's Ex. 1011; Tr. at 120:23-121:15.) No financial statements were exchanged. (Maxfield's Ex. 1781; Tr. at 72:12-18.) Genske was not involved in appraisals, listing or valuation of assets in connection with the divorce, and was "shocked and surprised" to hear that the parties got a divorce. (Gary Genske February 5, 2004 depo. at 262:15-263:2.) After the divorce decree was entered, Bruce Jennings and Anna Leah Jennings continued to live together in RKB's Crestview Property, a property which RKB had purchased *755 in 1987. (Tr. at 107:20-108:2.) [FN16]

> FN16. Bruce Jennings also lived in the Crestview Property at some point in the eighties (Tr. at 30:8-17) and when he purchased the Shoreview Property. (Tr. at 87:20-88:1.)

In June of 2000, Bruce Jennings and Janice Jennings testified in *Hollingsworth v. Bryco Arms* that the Shoreview Property was owned by RKB, that it was strictly a profit-making investment, that Anna Leah Jennings had no financial interest in the property, and that she was permitted to stay there because she took care of the property. (Tr. at 72:13-75:19.) Bruce Jennings and

Janice Jennings each heard the other give this testimony (Tr. at 73:15-75:5), specifically discussed it afterwards (Tr. at 175:19-176:15), had thirty days to make corrections to their testimony, and made none. (Tr. at 75:4-23.)

In December 2001, Anna Leah Jennings and RKB were joined as defendants in the Maxfield personal injury case. (Tr. at 177:7-13.) By December 2001, Bruce Jennings was aware that Maxfield was claiming damages for personal injuries and had received a statement of damages demanding $60 million. (Tr. at 6-11.) California had a homestead exemption of approximately $100,000. (Tr. at 178:15-23.) Bruce Jennings had invested millions of dollars in the Shoreview Property, which was not subject to any mortgages or encumbrances. (Tr. at 179: 6-11.) [FN17]

> FN17. At the trial of these adversary proceedings, Bruce Jennings claimed he had invested over $6,000,000 in the Shoreview Property.

In early 2002, Bruce Jennings consulted attorney Ned Nashban ("Nashban"). (Tr. at 185:6-19.) Nashban met with Bruce Jennings on January 25, 2002. (Maxfield's Ex. 1008.) On February 1, 2002, Nashban invoiced Jennings for prior "legal services regarding Florida residency, domicile, and exempt assets". (*Id.*) By that time, Bruce Jennings had signed a contract for purchase of a Florida homestead (Tr. at 185:20-24), and recorded a Florida declaration of domicile. (Tr. at 195:12-15.) On February 4, 2002, an appraisal of the Shoreview Property was ordered (Tr. at 186:24-187:2), on Nashban's instructions, in connection with the Maxfield personal injury case. (Tr. at 41:16-20.) Bruce Jennings had the appraisal invoice paid and accounted for by RKB as a litigation expense. (Tr. at 39:2-40:8.)

From its purchase in 1991 through February, 2002, RKB alone held title to the Shoreview Property, paid all of the property taxes, paid the homeowners' association dues, paid for all of the construction, and carried the property as an asset on its income tax returns. (Tr. at 136:2-24; 159:2-160:5.)

On February 18, 2002, the appraisal of the Shoreview

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

373 B.R. 742, 20 Fla. L. Weekly Fed. B 537
(Cite as: 373 B.R. 742)

Property came back. The Shoreview Property was appraised at $3,900,000. (Tr. at 195:16-21.) On February 22, 2002, Bruce Jennings prepared a deed (the "2002 Shoreview Deed") transferring the Shoreview Property from RKB to Anna Leah Jennings. The 2002 Shoreview Deed purported to be a deed replacing a lost deed transferring the Shoreview Property to Anna Leah Jennings as part of the parties' 1995 divorce. (Tr. at 198:23-199:13; 459:1-8.) FN18 On February 23, 2002, *756 Bruce Jennings sent the 2002 Shoreview Deed to Janice Jennings in Texas. (Tr. at 199:14-19.) Janice Jennings executed and returned the 2002 Shoreview Deed on behalf of RKB. On February 27, 2002, Bruce Jennings recorded it. (Tr. at 199:20-23.)

> FN18. At the trial of these adversary proceedings, Bruce Jennings testified he intended for Anna Leah Jennings to receive the 10 Shoreview Property as part of their divorce, that at that time he spoke to Janice Jennings as co-trustee of RKB about executing a deed of the Shoreview Property, and that he obtained and delivered a deed transferring the Shoreview Property to Anna Leah Jennings in 1995. (Tr. at 458:18-459:8.) Janice Jennings testified at the trial of these adversary proceedings that in 1995 she executed on behalf of RKB a deed transferring the Shoreview Property to Anna Leah Jennings as part of Anna Leah and Bruce Jennings' 1995 divorce settlement agreement. (Tr. at 979:25-980:19.)

On March 4, 2002, Bruce Jennings wrote a $500,000 check for an annuity, which the Court later found that he purchased with the fraudulent intent to keep out of the reach of his creditors. (Tr. at 215:23-216:11.) Bruce Jennings and Anna Leah Jennings, who still had an ongoing relationship at that time, traveled together to Clearwater, Florida to take delivery of the annuity contract. (Tr. at 478:4-479:1.)

On March 15, 2002, in the Maxfield personal injury case, Bruce Jennings served answers to interrogatories revealing RKB's transfer of the Shoreview Property to Anna Leah Jennings. (Tr. at 216:25-217:4.) Prior to that, Bruce Jennings had never once asserted that Anna

Leah Jennings owned the Shoreview Property. (Tr. at 217:5-10.)

On March 20, 2002, Maxfield filed a complaint in California Superior Court against a number of defendants to recover six assets, including the Shoreview Property, under theories of common law fraud, conspiracy, and fraudulent transfer (the "Maxfield Fraudulent Transfer Case"). On March 27, 2002, Anna Leah Jennings paid the Shoreview Property taxes for the first time. (Tr. at 217:18-218:6.) When RKB's 2001 tax return was filed later in 2002, Genske was instructed to remove the Shoreview Property as an RKB asset. (Maxfield Ex. 1501; Tr. at 218:7-219:1). Prior to that Genske had never heard that RKB had deeded the Shoreview Property to Anna Leah Jennings (Tr. at 610:7-20), even though he had been doing Bruce Jennings' and RKB's accounting work for almost twenty years (Tr. at 599:24-600:2; 790:22-791:8), and Anna Leah Jennings' work for five to six years. (Tr. at 600:22-601:6.)

At the trial of these adversary proceedings, Bruce Jennings testified that his testimony in the *Hollingsworth* matter (that the Shoreview Property was owned by RKB, that it was strictly a profit making investment, that Anna Leah Jennings had no financial interest in the property, and that she was permitted to stay there because she took care of the property) was an "outright lie". (Tr. at 173:24-25.) Janice Jennings testified that her testimony in the *Hollingsworth* matter was based upon the "assum[ption] that Anna Leah did not record the deed. The Shoreview [Property] was still on the tax returns. Property taxes were still being sent to RKB." (Tr. at 981:18-123.)

During 1995, at least two other deeds (signed by Janice Jennings) by which RKB transferred property and an affidavit filed by Janice Jennings in the *Sebastiano* case were notarized by Glenda McMurtrey ("McMurtrey"), a notary in Genske's office. (Maxfield's Exs. 928, 942, 645; Tr. at 1074:12-14.) McMurtrey's notary records do not include a deed evidencing the 1995 transfer of the Shoreview Property. (Maxfield's Ex. 1061.) Despite Maxfield's assertion for the three years leading up to the trial that McMurtrey was the only notary who notarized Janice Jennings' signature during 1995, Janice Jennings

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

373 B.R. 742, 20 Fla. L. Weekly Fed. B 537
(Cite as: 373 B.R. 742)

made no attempt to find one document from 1995 which was notarized by anyone other than McMurtrey. (Tr. at 1074:25-1075:5; 1078:6-13.)

*Procedural Posture of these Proceedings*

This litigation is comprised of four separate adversary proceedings, which were *757 consolidated for trial. They are as follows, listed chronologically.

As the Court previously noted, in May 2001 Maxfield commenced the Maxfield personal injury case. In addition to seeking relief against Bruce Jennings, Bryco, and B.L. Jennings, Maxfield also sought to recover from the assets of Janice Jennings, RKB, the California Trusts, and the Nevada Trusts any judgment liability obtained against Bruce Jennings, Bryco, and B.L. Jennings under joint venture/enterprise, partnership, and alter ego theories. After a jury trial, which found Bruce Jennings, Bryco, and B.L. Jennings to be partially at fault for Maxfield's injuries [FN19], on May 14, 2003, Bruce Jennings, Bryco, B.L. Jennings, Janice Jennings, RKB, the California Trusts, and the Nevada Trusts filed Chapter 11 bankruptcy petitions. At that point there had been no determination as to the joint venture/enterprise, partnership, and alter ego claims. The action was removed to this Court and became adversary 03-473.

> FN19. Maxfield holds a $24,774,146.53 judgment against Bruce Jennings, Bryco, and B.L. Jennings as a result of the jury verdict.

As the Court previously noted, in March 2002 Maxfield commenced the Maxfield Fraudulent Transfer Case. That action was also removed to the Court post-petition and became adversary 04-107. The only asset still at issue in this adversary proceeding is the Shoreview Property. The defendants against whom relief is sought are RKB, the Kimberly K. Jennings California Trust, the Bradley A. Jennings California Trust, and Janice Jennings.

On May 16, 2003, RKB, the California Trusts, and the Nevada Trusts filed a declaratory action which was designated as adversary 03-203 seeking a determination as to whether their assets are accountable for the claims of

various creditors, including Maxfield, Linda Bullard, and Jacob, Gary and Deborah Kramer and should be administered as part of the bankruptcy estates of Bruce Jennings, Bryco, and B.L. Jennings. The issues include partnership, joint venture, and alter ego liability. Maxfield has filed a cross claim against Janice Jennings, Bruce Jennings, Bryco, and B.L. Jennings. The issues include partnership, joint venture, and alter ego liability. Maxfield has also filed a counterclaim against RKB, the California Trusts and the Nevada Trusts. The issues include partnership, joint venture, and alter ego liability.

On August 29, 2003, Janice Jennings filed a declaratory action, which was designated as adversary 03-345, seeking a determination as to whether her assets are accountable for the claims of various creditors, including Maxfield, Linda Bullard, and Jacob, Gary and Deborah Kramer, and should be administered as part of the bankruptcy estates of Bruce Jennings, Bryco, and B.L. Jennings. The issues include partnership, joint venture, and alter ego liability.

## CONCLUSIONS OF LAW

### I. *RKB Investments, the California Trusts and their relation to Bruce Jennings*

#### A. *Were Bruce Jennings' Advances to RKB an Investment or a Loan?*

Initially, the Court finds it necessary to determine whether Bruce Jennings' advances to RKB were an investment or a loan. The Court finds that Bruce Jennings' infusion of money to RKB was as an investment. First, there was no evidence presented to the Court that Bruce Jennings' advances to RKB were as a loan. In addition, in its brief, RKB does not *758 present any evidence or argument that Bruce Jennings' advances were either loan or investment-the argument is merely made that if the Court finds the advances to be a loan, that the statute of limitations has passed. (Reply Br. of RKB at 4-10.) The Court does not feel it necessary to engage in independent analysis of the voluminous exhibits to de-

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

373 B.R. 742, 20 Fla. L. Weekly Fed. B 537
(Cite as: 373 B.R. 742)

termine that the advances were loans if no party feels it is necessary to categorize them as such.

Incidentally, however, the Court is certain that there is substantial evidence, which shows that the advances were indeed intended as an investment. Bruce Jennings intended to run his companies so as to maximize profit not only for himself, but for his children and family, as discussed *infra.* The abundance of evidence supports this finding. As a result, Bruce Jennings never intended for his advances to be repaid to him or any of his companies. It is quite clear that he funded the money to RKB as an investment, just as he did when he set up the Nevada Trusts and their contributions to Bryco, as the Court will discuss *infra*, in Section II. If Bruce Jennings had intended the advances to be a loan, the Court confidently opines that he would have taken the proposed repaid loan money and reinvested that money into the partnership to ensure its continued growth and success. His goal was to provide a money-making venture that would have continued success for his children. Thus, the Court finds that the weight of the evidence fully proves that Bruce Jennings' advances to RKB were intended as investments, and nothing more.

The Court finds that RKB owes Bruce Jennings $11,660,412. The Court finds that Bruce Jennings' bankruptcy estate's equity in RKB is not reducible by the $6,175,807, which Bruce Jennings invested in the Shoreview Property. First, for reasons discussed *infra* at Section IV, Part A, the transfer of the Shoreview Property was fraudulent. However, even if it were not, because Bruce Jennings' participation in RKB was as an investor, as an equity participant in RKB's profits and losses, he already suffered the claimed loss on the Shoreview Property. The Court also finds that Bruce Jennings' bankruptcy estate's equity in RKB is not reducible by $956,571 in cash or cash equivalent withdrawals claimed on RKB's 1999 tax return. Although Genske testified that the $956,571 was comprised of a note receivable in the amount of $85,005, a $10,000 title company deposit held in escrow, and an $850,000 withdrawal from a mutual fund, Genske failed to satisfactorily explain the source of his information. Genske's vague allusions to RKB's general ledgers from several

years prior to 1999 is wholly insufficient to satisfy Bruce Jennings' burden of proof. It is not the Court's burden to sift through several years and dozens of pages of inscrutable documents in an attempt to glean a reduction claimed by Bruce Jennings.

**B. *Choice of Law***

As an initial matter, the Court finds that California law applies to the issue of whether RKB and the California Trusts are the alter egos of Bruce Jennings. In their pre-trial briefs dated December 22, 2005 and December 23, 2005, the California Trusts, RKB, and Maxfield agreed that California law applies to the issue of whether RKB and the California Trusts are the alter egos of Bruce Jennings. (Docket Nos. 179, 180, 181.) Because the parties agreed, it is axiomatic that California law applies.

**C. *Are RKB and the California Trusts the Alter Egos of Bruce Jennings?***

[1][2] "Ordinarily, a corporation is regarded as a legal entity, separate and distinct*759 from its stockholders, officers and directors, with separate and distinct liabilities and obligations." *Sonora Diamond Corp.,* 83 Cal.App.4th 523, 99 Cal.Rptr.2d 824, 836 (5th Cal.Ct.App.2000) (citations omitted).[FN20]

> FN20. Although the case law most often deals with alter ego liability in the context of a corporation and an individual, partnerships and other business entities may also be found to be the "alter egos" of those in control or dominion over their assets. *See, e.g., In re Levander,* 180 F.3d 1114 (9th Cir.1999).

Under the alter ego doctrine [ ] when the corporate form is used to perpetrate a fraud, circumvent a statute, or accomplish some other wrongful or inequitable purpose, the courts will ignore the corporate entity and deem the corporation's acts to be those of the persons or organizations actually controlling the corporation, in most instances the equitable owners. *Id.* (citations omitted).

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

373 B.R. 742, 20 Fla. L. Weekly Fed. B 537
**(Cite as: 373 B.R. 742)**

[3][4][5][6][7][8][9] "Issues of alter ego do not lend themselves to strict rules and prima facie cases. Whether the corporate veil should be pierced depends on the innumerable individual equities of each case." *U.S. v. Standard Beauty Supply Stores, Inc.,* 561 F.2d 774, 777 (9th Cir.1977) (applying California law). *See also Mid-Century Ins. Co. v. Gardner,* 9 Cal.App.4th 1205, 1212, 11 Cal.Rptr.2d 918 (3d Cal.Ct.App.1992) (noting there is no "litmus test" to determine when the corporate veil will be pierced but that a court must consider the circumstances of each particular case); *Alexander v. Abbey of the Chimes,* 104 Cal.App.3d 39, 48, 163 Cal.Rptr. 377 (1st Cal.Ct.App.1980) (acknowledging courts' consideration of many factors to justify application of doctrine but reiterating its equitable nature). Generally, however, alter ego liability exists under California law where there is "such unity of interest and ownership that the separate personalities of the corporation and an individual no longer exist" and "if the acts are treated as those of the corporation alone, an inequitable result will follow." *Automotriz v. Resnick,* 47 Cal.2d 792, 796, 306 P.2d 1 (1957) (citation omitted).

> Certainly it is not sufficient to merely show that a creditor will remain unsatisfied if the corporate veil is not pierced, and thus set up such an unhappy circumstance as proof of an 'inequitable result'. In almost every circumstance where a plaintiff has attempted to invoke the doctrine, he is an unsatisfied creditor. The purpose of the doctrine is not to protect every unsatisfied creditor, but rather to afford him protection, where some conduct amounting to bad faith makes it inequitable ... for the equitable owner of a corporation to hide behind its corporate veil.

*Associated Vendors, Inc. v. Oakland Meat Co., Inc.,* 210 Cal.App.2d 825, 842, 26 Cal.Rptr. 806 (1st Cal.Ct.App.1962). However, a finding of bad faith is not a prerequisite to the application of the alter ego doctrine, *RRX Indus., Inc. v. Lab-Con, Inc.,* 772 F.2d 543, 546 (9th Cir.1985), and a party seeking to impose alter ego liability need not prove actual fraud, just that failure to impose alter ego liability would result in an injustice. *U.S. v. Healthwin-Midtown Convalescent Hosp. & Rehab. Center, Inc.,* 511 F.Supp. 416, 420 (C.D.Cal.1981)

(citations omitted). The manipulation of assets to the detriment of creditors supports a finding of an inequitable result. *NEC Electronics, Inc. v. Hurt,* 208 Cal.App.3d 772, 777-778, 256 Cal.Rptr. 441 (6th Cal.Ct.App.1989).

[10] While the determination of alter ego liability is at its core an equitable one, which must be made on a case-by-case basis, courts have nonetheless set forth *\*760 numerous factors in determining whether to pierce the corporate veil. *See Associated Vendors,* 210 Cal.App.2d at 842, 26 Cal.Rptr. 806. Among the factors which courts have considered are the commingling of funds and other assets of the two entities, use of one as a mere shell or conduit for the affairs of the other, *Sonora Diamond,* 99 Cal.Rptr.2d at 836, the treatment by an individual of the entity's assets as his own, and the failure to segregate funds of the individual and the entity. *Associated Vendors,* 210 Cal.App.2d at 838-839, 26 Cal.Rptr. 806.

[11] RKB and the California Trusts argue that there is no unity of interest between Bruce Jennings on one hand and RKB and the California Trusts on the other because: 1) Bruce Jennings had no ownership interest in RKB, and Janice Jennings was designated as the agent of RKB authorized to sign any documents necessary to transact partnership business; and 2) RKB and the California Trusts maintained separate bank accounts, corporate books, and tax returns for over fourteen years prior to the filing of the Maxfield suit. Additionally, RKB and the California Trusts argue that because they were funded years before the Maxfield case was filed, Maxfield is unable to prove that Bruce Jennings' contributions were made with a fraudulent or deceptive intent, which would thus fail to establish the second element necessary for the imposition of alter ego liability.

The Court finds that the evidence overwhelmingly establishes a unity of interest between Bruce Jennings and RKB. Bruce Jennings extensively commingled his funds with RKB. All of the assets held by RKB have belonged to Bruce Jennings since at least 1990 with Bruce Jennings alone taking all of the risk and Bruce Jennings alone deciding after the fact whether to treat his contributions to RKB either as an investment or a loan as the

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

373 B.R. 742, 20 Fla. L. Weekly Fed. B 537
**(Cite as: 373 B.R. 742)**

circumstances dictated. Bruce Jennings managed RKB and was solely responsible for managing its real estate portfolio. Bruce Jennings used RKB to purchase the Crestview [FN21] and Shoreview Properties, which he used as personal residences. Finally, the Court finds that Bruce Jennings was responsible for RKB's fraudulent transfer of the Shoreview Property to Anna Leah Jennings, which the Court will discuss fully *infra* at Section IV, Part A.

FN21. See Chart, cell 2A.

The Court finds RKB and the California Trusts' arguments unavailing. As the Court noted, since at least 1990 all of the assets held by RKB have belonged to Bruce Jennings, with Jennings alone taking all of the risk. Secondly, in light of the Court's finding that Janice Jennings' "management" of RKB was limited to Bruce Jennings' instruction, Janice Jennings' designation as the individual authorized to sign any documents necessary to transact partnership business does not militate against a finding of a unity of interest between Bruce Jennings and RKB. Finally, whether Bruce Jennings and RKB maintained separate bank accounts, corporate books, and tax returns is not the proper focus. As Maxfield points out, while the physical documents themselves may be separate, Bruce Jennings' finances are embedded within the financial records of RKB and the California Trusts. The books, records, and tax returns of Bruce Jennings, RKB, and the California Trusts have failed to disclose Bruce Jennings' interest in RKB (whether as loans, investments, debts, payables, receivables), but have instead carried Bruce Jennings' assets as those of RKB and the California Trusts. The audits of Bruce Jennings' individual tax returns conducted by the *761 State of California and the Internal Revenue Service did not involve any issues as to RKB and the California Trusts.

With respect to RKB's and the California Trusts' arguments as to the inequitable result element, Maxfield need not prove that Bruce Jennings made advances to RKB in bad faith, *RRX Indus.*, 772 F.2d at 547, or with a fraudulent intent, *Healthwin-Midtown*, 511 F.Supp. at 420. The Court finds that Bruce Jennings' initiation of and participation in the fraudulent transfer of the Shoreview Property is the quintessential example of the manipulation of assets to the detriment of creditors. The Court finds that failure to impose alter ego liability in the instant case would produce an inequitable result.

**D. *Was Bruce Jennings in a Partnership or Joint Venture with RKB and the California Trusts?***

Having found that RKB and the California Trusts are the alter egos of Bruce Jennings, the Court need not address whether RKB and the California Trusts were partners of or joint venturers with Bruce Jennings.[FN22]

> FN22. Maxfield's proposed judgment confirms that his argument as to partnership/joint venture liability is an alternative theory of relief to his argument as to alter ego liability.

**II. *Joint Venture Liability of the Nevada Trusts and Janice Jennings***

**A. *Choice of Law***

As an initial matter, the Court finds that Georgia law is inapplicable and California law governs these adversary proceedings. Linda Bullard's Post-Trial Brief references Georgia law as controlling the existence of a joint venture between Janice Jennings, the Nevada Trusts, and Bruce Jennings and his various corporations. (Bullard Post-Trial Br. at 3.) As previously stated by the Court, Maxfield agreed in his pre-trial brief dated December 23, 2005 that California law applies to the issue of joint venture liability. (Docket No. 181.) Linda Bullard filed a Pre-Trial Statement which adopted the positions taken by Maxfield. (Bullard Pre-Trial Statement at 1.) Therefore, Linda Bullard is now precluded from arguing the applicability of Georgia law.

**B. *Is there Joint Venture Liability for the Nevada Trusts and Janice Jennings?***

[12][13] "A joint venture is an undertaking by two or more persons to carry out a single enterprise for profit." *Stilwell v. Trutanich,* 178 Cal.App.2d 614, 619, 3 Cal.Rptr. 285 (2d Cal.Ct.App.1960). The elements of a

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

373 B.R. 742, 20 Fla. L. Weekly Fed. B 537
(Cite as: 373 B.R. 742)

joint venture are: 1) a community of interest in the subject of the undertaking; 2) a sharing in profits and losses; 3) an "equal right" or a "right in some measure" to direct and control the conduct of each other and of the enterprise; and 4) a fiduciary relationship between or among the parties. *Id.* (citations omitted).

[14] Maxfield argues that Janice Jennings, the Nevada Trusts, and Bruce Jennings operated a joint venture under the "Jennings Firearms" name. According to Maxfield, while the joint venture agreement between these parties envisioned the creation of Bryco to be owned by Janice Jennings and the Nevada Trusts, the Court should disregard the agreement's purported purpose that Bryco was intended to be a completely independent corporation and not a part of the "Jennings Firearms" joint venture. Case law states that when a corporation is used as an instrumentality or agency in carrying out a joint venture, courts will disregard the corporate form and enforce the joint venture agreement: in *762Drdlik v. Ulrich,* 203 Cal.App.2d 360, 21 Cal.Rptr. 642 (2d Cal.Ct.App.1962), and *Hillman v. Hillman Land Co.,* 81 Cal.App.2d 174, 183 P.2d 730 (2d Cal.Ct.App.1947), individuals entered into partnership agreements but subsequently created corporations to carry out the business of the partnerships; in other words, the corporations were instrumentalities of the partnerships consisting of the individuals.

**1. *Is Janice Jennings Jointly and Severally Liable as a Participant in a Joint Venture with Bruce Jennings, Bryco, and B.L. Jennings?***

[15][16][17] There are four elements of a joint venture, as aforementioned. While the existence of each element is necessary for a court to find that the parties were involved in a joint venture, there is a certain amount of flexibility. For example, a court must be able to find that there is a sharing of profits and losses, but it is not required that the distribution needs to be equal. *See Drdlik,* 203 Cal.App.2d at 364-65, 21 Cal.Rptr. 642. In addition, one party's right of control may be delegated to another. *Stilwell,* 178 Cal.App.2d at 621, 3 Cal.Rptr. 285 (citing *Oakley v. Rosen,* 76 Cal.App.2d 310, 173 P.2d 55 (2d Cal.Ct.App.1946), which held that "an

agreement under which plaintiffs merely invested money in a play to be produced by the defendant possessed all essential elements of a joint venture.")

[18] Despite the creation of Bryco and the oral agreement between Janice Jennings and the Nevada Trusts, the court finds sufficient evidence that a joint venture did in fact exist between Janice Jennings and Bruce Jennings, Bryco, and B.L. Jennings. Before delving into Janice Jennings' participation, however, it is necessary to examine the actions of Bruce Jennings. Bruce Jennings designed the guns to be manufactured by Bryco, yet never submitted his designs for approval to Janice or the Nevada Trusts. In essence, Bruce Jennings wore many hats under his umbrella of operations, Jennings Firearms. As a result, it appears from the voluminous record before the Court that Bruce Jennings controlled Bryco, and Janice Jennings was a willing participant in a joint venture with Bruce Jennings and all of his other entities. "[T]he corporation is treated as the mere agency of the associates, created for the sake of convenience in carrying out an agreement made before the corporation was organized." *Hillman,* 81 Cal.App.2d at 184-85, 183 P.2d 730. Thus, while Bruce Jennings organized Bryco to manufacture guns, the Court finds that the corporation was a mere instrumentality, "created for the sake of convenience in carrying out" the apparent agreement between Janice and Bruce Jennings before Bryco was incorporated.

Both Janice Jennings and Bruce Jennings shared a community of interest in the subject of the undertaking, Jennings Firearms. Bruce Jennings designed the guns, Bryco manufactured the guns, and B.L. Jennings distributed the guns. Janice Jennings shared in the profits and losses of the Jennings Firearms joint venture by receiving dividends as a shareholder and receiving a salary as president of Bryco. In addition, if B.L. Jennings suffered losses, as Bryco's only customer, that would be reflected in how much it could prepay Bryco for the guns it ordered.

The overwhelming weight of the evidence suggests that Janice Jennings delegated her authority to Bruce Jennings, thereby satisfying the third element. While president of Bryco, Janice Jennings permitted Bruce Jen-

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

373 B.R. 742, 20 Fla. L. Weekly Fed. B 537
(Cite as: 373 B.R. 742)

nings to set up a bank account in Bryco's secretary's individual name. Janice also breached her fiduciary duty many times as trustee of the Nevada Trusts. As sole owner, Janice Jennings *763 authorized to herself Bryco stock distributions of $200,000 and $600,000, from which she used funds to buy out the Nevada Trusts' 60% ownership interest for $62,700. In 1997, at a time when litigation was pending against Bruce Jennings and his various corporations, Janice Jennings voluntarily pledged a security interest in all of Bryco's assets to a major supplier. Janice Jennings authorized a distribution to herself and the Nevada Trusts of $320,000 from Mellado's account. As sole trustee of the Nevada Trusts, Janice Jennings owed the highest duty of care to the beneficiaries to ensure that their investment would not be dissipated. The Court finds that a reasonable trustee would not have breached her fiduciary duty but for the control of another dominant party, as was the case with Janice and Bruce Jennings. In addition, Janice Jennings disregarded corporate formalities or allowed Bruce Jennings to disregard corporate formalities multiple times, which, as president she should have thwarted. Again, this is evidence that Janice Jennings delegated her authority to Bruce Jennings and followed his instruction in running Bryco.

Lastly, there was a fiduciary relationship between Janice Jennings, Bruce Jennings, B.L. Jennings, and Bryco. Janice Jennings was president of Bryco, which was wholly dependent on B.L. Jennings, for its sales and marketing. Bruce Jennings designed the firearms, which, as the final product that Bryco manufactured, Janice Jennings needed the design to be perfect to keep Bryco successful. Thus, Janice Jennings had a fiduciary duty to B.L. Jennings and, more indirectly, to Jennings Firearms, by providing them with a quality firearm that could be resold. Bruce Jennings owed Janice Jennings a fiduciary duty through B.L. Jennings and Jennings Firearms, by continuing to purchase and market the guns that Bryco manufactured.

The Court finds that Janice Jennings was a participant in the joint venture Jennings Firearms. Ergo, Janice Jennings is jointly and severally liable for the injuries and damages inflicted by the defective guns, including

Maxfield's $24 million judgment.

### 2. Are the Nevada Trusts Jointly and Severally Liable as Participants in a Joint Venture with Bruce Jennings, Bryco, and B.L. Jennings?

[19] Maxfield asserts that, as was the case with Janice Jennings, the Court should disregard the original oral agreement that established Bryco as a corporation that Janice Jennings and the Nevada Trusts owed independently, and instead find that the Nevada Trusts were joint venturers with Bruce Jennings, Bryco and B.L. Jennings. The Nevada Trusts, however, insist that they were passive shareholders in a corporation and cannot be imputed as joint venturers by the mere ownership of stock. The dearth of evidence, the Nevada Trusts claim, supports their contention that they did not actively take part in the operation of Bryco, and use Bryco as an instrumentality in fulfilling the joint venture that was Jennings Firearms.

In *Hillman,* the plaintiff and the two defendants entered into an agreement by which the plaintiff would convey real property, which plaintiff then had an option to purchase on a corporation which was to be created. 81 Cal.App.2d at 177, 183 P.2d 730. The defendants would provide equal amounts of capital for the purchase and development of the property, and the plaintiff would provide services relating to the development of the property. *Id.* Stock in the corporation would be in equal shares to the plaintiff and the two defendants. The plaintiff and defendants would *764 each receive a third of the profits and wield a third of the voting power. Thereafter, the defendants failed to carry out their responsibilities embodied by the agreement. *Id.* at 179, 183 P.2d 730. The defendants attempted to force the plaintiff to relinquish his one-third interest and his share of the profits in the corporation by ceasing construction on and development of the properties. *Id.* The defendants sought dismissal of the complaint, arguing that the partnership or joint venture agreement between the parties was superceded when the corporation was formed and that they were therefore not individually liable to the plaintiff. *Id.* at 183, 183 P.2d 730. The trial court dismissed the complaint. *Id.* at 177, 183 P.2d 730.

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

373 B.R. 742, 20 Fla. L. Weekly Fed. B 537
(Cite as: 373 B.R. 742)

The appellate court noted that

> [s]ince it appears from the entire pleading that the corporation was merely an instrumentality of the partnership or joint venture consisting of the three individuals, plaintiff, though not entitled to vote in the corporation until he acquired the capital stock that [defendants] agreed to transfer to him, would be entitled to his share of the profits derived from the corporate transaction.

*Id.* at 184, 183 P.2d 730. The court also stated

> [w]here a corporation is the instrumentality of individuals who control the conduct of its affairs and where the interests of third parties are not affected, the corporation is treated as the mere agency of the associates created for the sake of convenience in carrying out an agreement made before the corporation was organized.

*Id.* at 184-185, 183 P.2d 730 (citation omitted).

[20] *Hillman* is not analogous to the case before the Court with respect to the Nevada Trusts. The holding of *Hillman* was that the corporate form could not be used as a shield by individuals against another individual, to invalidate a joint venture agreement entered into by the three. *Hillman* does not stand for the proposition that a passive investor in a corporation, which is involved in a joint venture, is itself a joint venturer by mere virtue of its ownership interest in the corporation.

The Nevada Trusts received dividends as shareholders of Bryco, filed separate tax returns from their inception up to and including their filing of bankruptcy, and kept separate books and records from each other and from any other defendant in these adversary proceedings. While the Nevada Trusts received dividends as shareholders of Bryco just as Janice Jennings did, she took an active role in the assessment of dividends and the release of those dividends to shareholders; the Nevada Trusts merely accepted the dividends as a form of investment. There is absolutely no evidence before the Court that could remotely connect the Nevada Trusts with the umbrella joint venture of Jennings Firearms. All actions with respect to Bryco were conducted by Janice Jennings, who wore two hats-one as the sole trustee of the Nevada Trusts who owed a fiduciary duty to the beneficiaries as trustee, and one as president of Bryco who owed a duty to the shareholders so as to not dissipate their investment. There is no evidence that the Nevada Trusts engaged in the active operation of Bryco. The Nevada Trusts were not responsible for any of Bryco's obligations. Instead, they were merely passive shareholders who did not exert any control of the operations of Bryco. Thus, the Nevada Trusts were not involved in a joint venture with Bruce Jennings, Janice Jennings, Bryco and B.L. Jennings, and therefore cannot be joint venturers with Jennings Firearms. As a result, the Nevada Trusts are not *765 liable to Maxfield or any other claimant in these proceedings.

## III. *Constructive Trust*

[21][22][23][24] Maxfield seeks the imposition of a constructive trust on the assets of RKB and the California Trusts for the benefit of Bruce Jennings' bankruptcy estate. "A constructive trust is an involuntary equitable trust created by operation of law as a remedy to compel the transfer of property from the person wrongfully holding it to the rightful owner." *Communist Party v. 522 Valencia, Inc.,* 35 Cal.App.4th 980, 990, 41 Cal.Rptr.2d 618 (1st Cal.Ct.App.1995) (citations omitted). The purpose of a constructive trust is to prevent unjust enrichment and to prevent one from taking advantage of his own wrongdoing. *Id.* (citations omitted). The principal circumstances under which constructive trusts are imposed are codified in California Civil Code §§ 2223 and 2224. *Id.* Section 2223 of the California Civil Code provides that "[o]ne who wrongfully detains a thing is an involuntary trustee thereof, for the benefit of the owner." Section 2224 of the California Civil Code provides that "[o]ne who gains a thing by fraud, accident, mistake, undue influence, the violation of a trust, or other wrongful act, is, unless he or she has some other and better right thereto, an involuntary trustee of the thing gained, for the benefit of the person who would otherwise have had it." The imposition of a constructive trust as defined in §§ 2223 or 2224 requires: 1) the existence of a res; 2) the right of a complaining party to that res; and 3) some wrongful acquisition or

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

373 B.R. 742, 20 Fla. L. Weekly Fed. B 537
(Cite as: 373 B.R. 742)

retention of the res by another party who is not entitled to it. *522 Valencia*, 35 Cal.App.4th at 990, 41 Cal.Rptr.2d 618 (citations omitted). The propriety of imposing a constructive trust is committed to the sound discretion of the trial court, taking into account the facts and circumstances of the case. *Welch Co. v. Erskine & Tulley*, 203 Cal.App.3d 884, 250 Cal.Rptr. 339 (1st Cal.Ct.App.1988).

[25] Maxfield asserts that the imposition of a constructive trust is warranted because of the "imbalance" which resulted from Bruce Jennings' supplying all of RKB's capital and assuming all the risk of its investment losses, and the California Trusts withdrawing more than their share of equity. The Court has already found that RKB and the California Trusts are Bruce Jennings' alter egos. When these adversary proceedings were filed, Bruce Jennings' case was a Chapter 11 case. On June 7, 2005 the Court converted Bruce Jennings' case to a Chapter 7 case and a Chapter 7 trustee was assigned to the case. Because there is a Chapter 7 trustee in place, the Court does not believe the imposition of a constructive trust is warranted.

**IV. Tort (UFTA/Liability Conspiracy/Fraud)**

**A. Did RKB Fraudulently Transfer the Shoreview Property?**

[26] California has adopted the Uniform Fraudulent Transfer Act ("CA-UFTA") with modifications. CAL. CIVIL CODE §§ 3439-3439.12 (West 2002). Section 3439.04(a) of CA-UFTA provides that

[a] transfer made or obligation incurred by a debtor is fraudulent as to a creditor, whether the creditor's claim arose before or after the transfer was made or the obligation was incurred, if the debtor made the transfer or incurred the obligation ... (1) With actual intent to hinder, delay, or defraud any creditor of the debtor.

Section 3439.04(b) sets forth a number of factors a trial court may consider in determining whether a debtor made a transfer with the actual intent to hinder, delay, or *766 defraud a creditor. *Id.* at § 3439.04(b). These

factors are: 1) whether the transfer or obligation was to an insider; 2) whether the debtor retained possession or control of the property transferred after the transfer; 3) whether the transfer or obligation was disclosed or concealed; 4) whether before the transfer was made or obligation was incurred, the debtor had been sued or threatened with suit; 5) whether the transfer was of substantially all the debtor's assets; 6) whether the debtor absconded; 7) whether the debtor removed or concealed assets; 8) whether the value of the consideration received by the debtor was reasonably equivalent to the value of the asset transferred or the amount of the obligation incurred; 9) whether the debtor was insolvent or became insolvent shortly after the transfer was made or the obligation was incurred; 10) whether the transfer occurred shortly before or shortly after a substantial debt was incurred; 11) whether the debtor transferred the essential assets of the business to a lienholder who transferred the assets to an insider of the debtor. *Id.*

[T]hese factors do not create a mathematical formula to establish actual intent. There is no minimum number of factors that must be present before the scales tip in favor of finding of actual intent to defraud. This list of factors is meant to provide guidance to the trial court, not compel a finding one way or the other.

*Filip v. Bucurenciu*, 129 Cal.App.4th 825, 834, 28 Cal.Rptr.3d 884 (3rd Cal.Ct.App.2005). Remedies under CA-UFTA include avoidance of the transfer (§ 3439.07(a)(1)) or "any other relief the circumstances may require". CAL. CIVIL CODE § 3439.08(c) (West 2002). This includes "judgment for the value of the asset transferred" ( § 3439.08(b)), and imposition of a constructive trust. *Monastra v. Konica Business Machines, U.S.A., Inc.*, 43 Cal.App.4th 1628, 1644-1645, 51 Cal.Rptr.2d 528 (2d Cal.Ct.App.1996).

[27] RKB and the California Trusts assert that unless they are found to be Bruce Jennings' alter egos, there can be no fraudulent transfers with respect to Maxfield because Maxfield is not a creditor of RKB. Having found that RKB and the California Trusts are Bruce Jennings' alter egos, the Court turns to the issue of whether RKB fraudulently transferred the Shoreview Property to Anna Leah Jennings. Initially, the Court

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

**373 B.R. 742, 20 Fla. L. Weekly Fed. B 537**
**(Cite as: 373 B.R. 742)**

finds that Maxfield proved that the transfer of the Shoreview Property occurred in February 2002, rather than in 1995, and was not part of Bruce Jennings' and Anna Leah Jennings' divorce settlement. A number of factors support such a conclusion. First, in June 2000 Bruce Jennings and Janice Jennings testified in *Hollingsworth v. Bryco Arms* that the Shoreview Property was owned by RKB, that it was strictly a profit-making investment, that Anna Leah Jennings had no financial interest in the property, and that she was permitted to stay there because she took care of the property. (Tr. at 72:13-75:19.) Bruce Jennings and Janice Jennings each heard the other give this testimony (Tr. at 73:15-75:5), specifically discussed it afterwards (Tr. at 175:19-176:15), had thirty days to make corrections to their testimony, and made none. (Tr. at 75:4-23.) Janice Jennings' trial testimony that in 1995 she signed a deed transferring the Shoreview Property to Anna Leah Jennings as part of Bruce Jennings' divorce settlement despite having testified to the contrary in the *Hollingsworth* matter in 2000 because at that time (during 2000) she assumed that Anna Leah did not record the deed, that the Shoreview Property was still on the tax returns, and that property taxes were still being *767 sent to RKB, has no credibility.[FN23] While the recordation of a deed is not necessary to effectuate the transfer of real property embodied therein, given Anna Leah Jennings' familiarity with deeds and her general business acumen, there is not one reason for the Court to believe that she would not have recorded the deed to the Shoreview Property during 1995 had it been transferred to her at that time. Most importantly, despite Maxfield's assertion for the three years leading up to the trial that McMurtrey was the only notary who notarized Janice Jennings' signature during 1995, she made no attempt to find even one document from 1995 which was notarized by anyone other than McMurtrey. Additionally, Bruce Jennings' trial testimony that his testimony in the *Hollingsworth* matter was an "outright lie", without any further explanation, has no probative value.[FN24]

FN23. Aside from the complete lack of credibility, Janice Jennings' testimony is also subject to judicial estoppel. "Judicial estoppel is applied to the calculated assertion of divergent

sworn positions ... and is designed to prevent parties from making a mockery of justice by inconsistent pleadings." *In re Pittman*, 289 B.R. 448, 451 (Bankr.M.D.Fla.2003) (quoting *American National Bank v. Federal Deposit Ins. Corp.*, 710 F.2d 1528, 1536 (11th Cir.1983)).

FN24. Bruce Jennings' testimony with respect to this issue is also subject to judicial estoppel.

Second, RKB alone continued to pay all of the property taxes, paid the homeowners' association dues, paid for all of the construction, and carried the property as an asset on its income tax returns. If the Shoreview Property had been transferred to Anna Leah Jennings in 1995, she would have been responsible for the property taxes and homeowner's association dues. RKB would not have continued to carry the property as an asset on its tax returns. Finally, despite having performed Bruce Jennings' and RKB's accounting work for twenty years and Anna Leah Jennings' accounting work for five or six years, Genske had no knowledge of RKB's purported 1995 transfer of the Shoreview Property to Anna Leah Jennings until he was instructed to remove it as an RKB asset on RKB's 2001 tax return. The Court finds that these factors, taken together, overwhelmingly establish that the Shoreview Property was transferred to Anna Leah Jennings in 2002, not in 1995 as part of her and Bruce Jennings' divorce.

[28] Having found that RKB transferred the Shoreview Property to Anna Leah Jennings in 2002, the Court turns to an analysis of the badges of fraud under CA-UFTA, discussing only those which are relevant. First, the Court finds that the transfer of the Shoreview Property to Anna Leah Jennings by RKB at Bruce Jennings' behest was a transfer to an insider. While Bruce Jennings and Anna Leah Jennings were not married at the time of the transfer, they were married from 1986 to 1995, had been involved in an on-and-off relationship since that time and were "on" at the time of the transfer. Second, prior to the transfer of the Shoreview Property, both Bruce Jennings and RKB had been sued by Maxfield. At the time of the transfer, Bruce Jennings was aware that Maxfield was claiming damages for personal injuries and had received a statement of damages

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

373 B.R. 742, 20 Fla. L. Weekly Fed. B 537
(Cite as: 373 B.R. 742)

demanding $60 million. California had an approximate $100,000 homestead exemption, merely a fraction of the millions of dollars Bruce Jennings had invested in the unencumbered Shoreview Property. Finally, RKB did not receive any consideration in exchange for the transfer of the Shoreview Property, as Bruce Jennings had no outstanding obligation to Anna Leah Jennings resulting from their 1995 divorce. These *768 factors coupled with the totality of the circumstances surrounding the transfer of the Shoreview Property, lead the Court to conclude that RKB, through Bruce Jennings, transferred the Shoreview Property to Anna Leah Jennings with the actual intent to hinder, delay, or defraud creditors. As its general partners, the California Trusts are jointly and severally liable with RKB to Bruce Jennings' creditors for the value of the Shoreview Property.

Maxfield also points out that CA-UFTA does not preclude recovery under other theories and that fraudulent transfers are also subject to attack as common law fraud. However, Maxfield makes such an argument in passing and neither: 1) cites any cases which set forth the elements of common law fraud nor 2) explains how the transfer of the Shoreview Property constitutes common law fraud. The Court declines to independently research the matter.

### B. *Was Janice Jennings a Conspirator in the Fraudulent Transfer of the Shoreview Property?*

Next, Maxfield asserts that Janice Jennings should be adjudged jointly and severally liable for the damages to the creditors of Bruce Jennings' bankruptcy estate based on her participation in a conspiracy to fraudulently transfer the Shoreview Property. More specifically, Maxfield asserts that Bruce Jennings transferred the Shoreview Property to Anna Leah Jennings and that as an aider and abettor of Bruce Jennings' fraud, Janice Jennings is liable to Bruce Jennings' creditors for damages equal to the value of the property transferred.

[29][30][31][32][33][34][35] A fraudulent transfer under the UFTA is tortious conduct, which will support a conspiracy claim. *Filip*, 129 Cal.App.4th at 837, 28 Cal.Rptr.3d 884. Conspiracy is not an independent tort

but is instead a theory of liability. *Qwest Communications Corp. v. Weisz*, 278 F.Supp.2d 1188, 1192 (S.D.Cal.2003). Its chief purpose is to extend liability beyond the principals who actually committed the tort. *Id.* "The sole caveat is that the co-conspirator must be legally capable of committing the tort, i.e., that he or she owes a duty to plaintiff recognized by law and is potentially subject to liability for breach of that duty." *Id.* (internal quotation and citation omitted). The elements of civil conspiracy are the formation and operation of the conspiracy and damages resulting to the plaintiff. *Monastra*, 43 Cal.App.4th at 1644-1645, 51 Cal.Rptr.2d 528. A conspirator must have knowledge that an actual tort is planned as well as the intent to aid in its commission. *Kidron v. Movie Acquisition Corp.*, 40 Cal.App.4th 1571, 1582, 47 Cal.Rptr.2d 752 (2d Cal.Ct.App.1995). Direct proof of an agreement to defraud is not required. "The cases have frequently taken notice of the fact that it is next to impossible to secure direct evidence of a conspiracy, unless one of the participants has confessed, and that the proof must usually be inferential and circumstantial." *Campbell v. Birch*, 19 Cal.2d 778, 789, 122 P.2d 902 (Cal.1942).

[36] Upon the evidence before it, the Court finds that Janice Jennings participated in a conspiracy with Bruce Jennings/RKB to fraudulently transfer the Shoreview Property to Anna Leah Jennings. As the Court previously noted, Janice Jennings' trial testimony that she signed a deed in 1995 is not credible. When she signed the 2002 Shoreview Deed, Janice Jennings knew that it was not a replacement deed. Given her testimony in the *Hollingsworth* matter, Janice Jennings also knew that Bruce Jennings had no outstanding obligation to Anna Leah Jennings resulting from their 1995 divorce. Janice Jennings knew that RKB *769 was a defendant in the Maxfield case, in which Maxfield was claiming millions of dollars in damages. She also knew that Bruce Jennings had invested millions of dollars in the Shoreview Property, which was then unencumbered. The Court finds that the circumstantial evidence establishes that Janice Jennings knew that RKB, through Bruce Jennings, intended to transfer the Shoreview Property to Anna Leah Jennings to keep it out of the hands of creditors. By signing the deed on behalf of RKB to transfer

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

373 B.R. 742, 20 Fla. L. Weekly Fed. B 537
**(Cite as: 373 B.R. 742)**

the Shoreview Property to Anna Leah Jennings in ex-
change for no consideration, Janice Jennings aided in
the transfer. Because Janice Jennings participated in the
conspiracy to transfer the Shoreview Property, she is li-
able to Bruce Jennings' creditors for the value of the
Shoreview Property.

### *CONCLUSION*

Because: 1) there was such a unity of interest and own-
ership between Bruce Jennings and RKB that the separ-
ate personalities of Bruce Jennings and RKB no longer
existed and 2) if the acts of RKB were treated as those
of RKB alone, an inequitable result would follow, RKB
is Bruce Jennings' alter ego. The Kimberly K. Jennings
California Trust and the Bradley A. Jennings California
Trust are also Bruce Jennings' alter egos. Because: 1)
there was a community of interest between Janice Jen-
nings and Bruce Jennings and his entities in the Jen-
nings Firearms brand; 2) Janice Jennings shared in the
profits and losses of Jennings Firearms through her em-
ployment with and ownership in Bryco; 3) Janice Jen-
nings delegated her authority to Bruce Jennings; and 4)
there was a fiduciary relationship between Janice Jen-
nings as owner and president of Bryco and Bruce Jen-
nings and his entities, Janice Jennings is jointly and sev-
erally liable as a participant in a joint venture with
Bruce Jennings, Bryco, and B.L. Jennings. There is in-
sufficient evidence to prove that the Nevada Trusts are
jointly and severally liable as participants in a joint ven-
ture with Bruce Jennings, Bryco, and B.L. Jennings.
RKB fraudulently transferred the Shoreview Property to
Anna Leah Jennings with the intent to hinder, delay or
defraud creditors. Finally, Janice Jennings was a con-
spirator in the fraudulent transfer of the Shoreview
Property. A judgment in accordance with these findings
of fact and conclusions of law will be separately entered.

Bkrtcy.M.D.Fla.,2007.
In re B.L. Jennings, Inc.
373 B.R. 742, 20 Fla. L. Weekly Fed. B 537

END OF DOCUMENT

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.